UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

David T. Veale and Scott W.
Veale

    v.                                    Civil No. 10-cv-147-JL
                                              Opinion No. 2012 DNH 029
Robert T. Furness, Apple Tree
Animal Hospital, Tufts University
Steven Rowell, Windham Veterinary
Clinic, Stephen Angell, Angell
Animal Medical Center, Megan
Sullivan, New England Veterinary
Oncology Group, LLC, Jeff
Philibert, Animal Medical Center,
Veterinary Emergency Specialty
Center of New England, Veterinary
Emergency Center of Manchester,
Capital Area Veterinary Emergency
Center, Emergency Veterinary
Clinic of the Seacoast


**MEMORANDUM ORDER**

Plaintiffs David and Scott Veale, proceeding pro se, have

brought this suit against a number of veterinary professionals

and organizations who, they allege, committed malpractice that

resulted in the death of their dog, Elsie.  In addition to state-

law claims for breach of contract, negligence, veterinary

malpractice, bailment, and fraud, the Veales have asserted

federal claims for conspiracy to interfere with their civil

rights under 42 U.S.C. § 1985(3) and violations of the Racketeer

Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §

1961 et seq.  Defendants have moved to dismiss the suit, arguing,

among other things, that the Veales' complaint fails to state a

1

claim under federal law, see Fed. R. Civ. P. 12(b)(6), and that, because at least one plaintiff and one defendant are citizens of the same state, this court lacks subject-matter jurisdiction over the remaining state-law claims, see 28 U.S.C. § 1332(a)(1).  For essentially those reasons, the court dismisses the case.

## I. **Applicable legal standard**

To survive a motion to dismiss under Rule 12(b)(6), the plaintiff's complaint must make factual allegations sufficient to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 1940. In ruling on such a motion, the court must accept as true all well-pleaded facts set forth in the complaint and must draw all reasonable inferences in the plaintiff's favor.  See, e.g., Martino v. Forward Air, Inc., 609 F.3d 1, 2 (1st Cir. 2010).

Similarly, when evaluating a motion to dismiss for lack of jurisdiction under Rule 12(b)(1), the court "accept[s] as true all material allegations of the complaint, and construe[s] the complaint in favor of the complaining party." Peterson v. United States, 774 F. Supp. 2d 418, 421 (D.N.H. 2011) (quoting Warth v. Seldin, 422 U.S. 490, 501 (1975)).  However, "the burden lies

with the plaintiff, as the party invoking the court's jurisdiction, to establish that it extends to his claims." Id. (citing Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994)).

The following background summary is consistent with that approach.

## II.  **Background**

In mid- to late September 2006, Elsie, a 10-year old English setter belonging to plaintiffs David and Scott Veale, developed a serious pyrothorax infection which caused a great deal of pus and swelling to accumulate in her chest and around her lungs.  The Veales brought Elsie to Dr. Robert Furness, a veterinarian at Apple Tree Animal Hospital in Hopkinton, New Hampshire.  This, they say, was a mistake--Dr. Furness, motivated by "group hatred toward the Plaintiffs because of who they are and their false reputations," conspired with "others" to harm Elsie.  Among other things, Dr. Furness allegedly misdiagnosed Elsie with an infected uterus, prescribed unnecessary medication, and performed unnecessary surgery to remove her uterus.  During this surgery, Dr. Furness either intentionally or negligently caused lesions to Elsie's spleen, liver, kidney, heart, and lungs.

Immediately after the surgery, the Veales picked up Elsie from Apple Tree and took her to Tufts University's Hospital for

Small Animals to obtain a second opinion.  The personnel at Tufts told the Veales that Elsie was in very critical condition, and would die if not treated for her chest infection and the injuries suffered during surgery.  Over the next several days, Tufts personnel stabilized Elsie and contacted Dr. Furness.  They then performed an additional surgery on Elsie "to straighten a few things out."  The surgery appeared to have gone well.  However, when the Veales picked up Elsie from Tufts, they were not told about any test results or recommended follow-up treatments; nor did Tufts provide them with a copy of Elsie's records.

For the next several months, Dr. Stephen Angell of Windham Animal Hospital in Brattleboro, Vermont treated Elsie.  He did not provide the Veales with any opinion about what had happened to Elsie.  The Veales remained concerned about Elsie's condition, and contacted a Dr. Whalen at Tufts regarding those concerns. After Tufts finally sent Elsie's records to the Veales in March 2007, they discovered that, in November 2006, Tufts had received test results suggesting that Elsie should have received further x-rays to monitor the progress of her internal injuries.

On Friday, March 23--within a week of receiving the records--the Veales noticed that Elsie was becoming weak and was "not her usual self."  They immediately brought her to the Capital Area Veterinary Emergency Center ("CAVEC") in Concord, New Hampshire, which referred them to Dr. Megan Sullivan at Angell Animal

4

Medical Center ("AAMC") in Boston, Massachusetts.  After examining Elsie, Dr. Sullivan informed the Veales that Elsie had developed very serious stage V leukemia.  She told them that it would cost "thousands and thousands of dollars" to begin treating her for the cancer, and recommended that they arrange to have Elsie euthanized.  When the Veales asked that AAMC perform an ultrasound and urinalysis, Dr. Sullivan told them that AAMC did not have enough time to do any further tests or treatments to help save Elsie at that time.  She also told the Veales that she did not believe the cancer had been caused by anything Dr. Furness or Tufts had done.

The Veales then brought Elsie to the Veterinary Emergency & Specialty Hospital in South Deerfield, Massachusetts, which agreed to perform the ultrasound.  The ultrasound revealed numerous unusual lesions in Elsie's spleen and on her liver. Armed with these results, the Veales brought Elsie to Dr. Jeff Philibert at the New England Veterinary Oncology Group ("NEVOG"). Dr. Philibert recommended a cancer treatment plan for Elsie. After the first treatment, Elsie had a mild reaction that caused bleeding from her nose.  Dr. Philibert nonetheless recommended further treatment, which caused additional serious reactions, including additional bleeding.

NEVOG advised the Veales to take Elsie to the Animal Medical Center ("AMC") in Nashua, New Hampshire for further evaluation.

5

AMC allegedly told the Veales that it had the largest blood bank supply in New Hampshire, and that it would be able to treat Elsie for her cancer.  Nonetheless, the day after Elsie arrived, AMC called the Veales to ask whether they knew Elsie's blood type, as it had given her some "bad blood" to which she had an adverse reaction.  AMC further told the Veales that it was "not sure whether it was the right blood or not, or what blood type Elsie had."  The Veales allege that Elsie contracted a serious blood disease due to this "bad blood."  AMC asked them to pick up Elsie and take her directly to the Veterinary Emergency and Specialty Center of New England ("VESCONE") in Waltham, Massachusetts.

VESCONE admitted Elsie and performed several tests.  It discovered that Elsie had been suffering for some time from a serious bladder infection, which had not been treated.  It was unable, though, to find or match her blood type, and therefore was unable to begin a treatment plan for her blood disease.  The Veales again picked up Elsie and took her to the Veterinary Emergency Center of Manchester, New Hampshire ("VECM").  VECM was able to immediately match Elsie's blood type, and gave her a transfusion.  It told the Veales, however, that it had no other means of treating her, and recommended that she be euthanized.

Not long thereafter, the Veales brought Elsie back to CAVEC in Concord, after CAVEC told them that it had the right blood type and could provide the additional treatment Elsie needed to

survive.  After examining Elsie, however, CAVEC decided it would not treat her, and referred the Veales to Emergency Veterinary Clinic of the Seacoast ("EVCS") in Portsmouth, New Hampshire. EVCS completed a blood transfusion for Elsie, but told the Veales that it could not do anything else for her, either.  It recommended that they take Elsie back to Dr. Phillibert and NEVOG for further evaluation.

The Veales instead brought Elsie to Cornell University, which recommended that she be euthanized due to her serious condition.  The Veales finally agreed to this, and Elsie was put down.  Cornell then performed a necropsy that revealed that Elsie had a fatal blood disease, which the Veales allege she contracted from the transfusion of "bad blood" she received at AMC.  That disease had gone undiagnosed by all of the various veterinary professionals that examined Elsie after her visit at AMC.

The Veales subsequently filed the present suit against nearly all of the individuals and entities who provided care to Elsie from September 2006 onward.  They allege that defendants were engaged in a broad-ranging conspiracy reaching across state lines.  Among other things, they allege, defendants chose not to provide appropriate veterinary treatment for Elsie, failed to document all of Elsie's ailments and their causes, and concealed information regarding Elsie's condition from them--including the alleged connections between Elsie's conditions and the treatments

she had previously received--all in order to escape liability for their own wrongdoing.  In addition, defendants provided Elsie with different treatments than those outlined in their original estimates and agreements, not only to hide their wrongdoing, but also in order to mistreat both the Veales and Elsie.  All this, in addition to causing Elsie's death, caused the Veales to incur tens of thousands of dollars in unnecessary veterinary expenses.

## III.  **Analysis**

### A.  *Conspiracy to interfere with civil rights under 42 U.S.C. § 1985(3)*

As noted, the Veales assert a claim against defendants pursuant to 42 U.S.C. § 1985(3) for an alleged conspiracy to deprive them of their civil rights.  To state a cognizable claim under this section, a plaintiff must allege four elements:

> First, the plaintiff must allege a conspiracy; second, he must allege a conspiratorial purpose to deprive the plaintiff of the equal protection of the laws; third, he must identify an overt act in furtherance of the conspiracy; and finally, he must show either injury to person or property, or a deprivation of a constitutionally protected right.

Perez-Sanchez v. Public Building Auth., 531 F.3d 104, 107 (1st Cir. 2008).

The court need not look beyond the second of these elements. In connection with that requirement, "[i]t has long been established that a claim under § 1985(3) requires some racial, or perhaps otherwise class-based, invidiously discriminatory animus

behind the conspirators' action." Id. (quoting Griffin v. Breckenridge, 403 U.S. 88, 102 (1971)); see also Veale v. Griffin, 215 F.3d 1313 (1st Cir. 2000) (table) (affirming dismissal of § 1985(3) claim where plaintiff--the same plaintiff in this case--failed to allege class-based animus); Veale v. Penuche's Ale House, No. 98-447-B, 1998 WL 1120388, *6 (D.N.H. Nov. 2, 1998)(similar; also the same plaintiff as here).  The Veales do not plausibly allege that defendants' conspiracy was motivated by any racial or otherwise class-based animus.

The Veales do aver, in a single paragraph of the complaint, that Dr. Furness's alleged actions were a result of "group animus" and "group hatred toward the Plaintiffs because of who they are and their false reputations."  Am. Compl. (document no. 15) ¶ 23.  But the complaint provides no further factual detail regarding "who they are," i.e., what class they belong to, nor does it explain what the Veales' "reputations" are or, for that matter, how reputation-based animus would entitle them to relief under § 1985(3).  At best, then, the complaint's passing references to "group hatred" and "group animus" amount to no more than "a formulaic recitation of the elements" of their claim and "naked assertions devoid of further factual enhancement," neither of which meets the federal pleading standards.  Iqbal, 129 S. Ct. at 1949.  Accordingly, the Veales' claim under 42 U.S.C. § 1985(3) is dismissed.

**B.    *Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq.***

The Veales have also asserted a claim under RICO, 18 U.S.C. § 1961 et seq., arising from the alleged conspiracy among defendants.  "To state a RICO claim, plaintiffs must allege four elements:  (1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity." Giuliano v. Fulton, 399 F.3d 381, 386 (1st Cir. 2005).

Here, it is the fourth element on which the Veales' claim founders.  RICO defines "racketeering activity" by reference to a lengthy list of state and federal criminal offenses, including but not limited to murder, kidnapping, gambling, arson, robbery, bribery, extortion, and dealing in controlled substances.  See 18 U.S.C. § 1961(1).  While that definition encompasses an extremely broad range of conduct, the court is at a loss to see how the actions alleged in the complaint could plausibly constitute a single instance of racketeering activity, let alone make out a pattern of such activity.  The complaint itself does not refer to any specific predicate acts that could give rise to a RICO claim. The Veales suggest in their memoranda that defendants committed mail or wire fraud, but they do not explain how the complaint alleges the elements of either of those offenses, particularly where are no allegations in the complaint that the defendants ever mailed anything, as part of a scheme to defraud or otherwise, see 18 U.S.C. § 1341, or that during the few phone

conversations defendants had with plaintiffs, they made any statements in furtherance of a scheme to defraud, see id. § 1343. Although the complaint does make generic allegations of common-law fraud, that does not constitute an "racketeering activity" subject to the RICO statute. Giuliano, 399 F.3d at 388. The Veales' RICO claim is therefore dismissed.

## C.   *Plaintiffs' remaining claims*

The Veales' federal statutory claims under 42 U.S.C. § 1985(3) and RICO provided the sole basis upon which this court was empowered to exercise jurisdiction. See 28 U.S.C. § 1331. Each of their remaining claims arises solely under state law, and typically this court may only exercise jurisdiction over such claims if the prerequisites to diversity jurisdiction in 28 U.S.C. § 1332 are met. See In re Olympic Mills Corp., 477 F.3d 1, 6 (1st Cir. 2007). Here, those requirements are not met: plaintiffs David and Scott Veale are citizens of Vermont and New Hampshire, respectively, and they have named citizens of both those states as defendants.[1] As a result, this court does not have jurisdiction over the Veales' state-law claims under § 1332.

---

[1]Robert Furness, Apple Tree Animal Hospital, the Animal Medical Center, the Veterinary Emergency Center of Manchester, the Capital Area Veterinary Emergency Center, and the Emergency Veterinary Clinic of the Seacoast are alleged to be citizens of New Hampshire, while Stephen Angell and Windham Veterinary Clinic are alleged to be citizens of Vermont.

See id. ("In [diversity] cases involving multiple plaintiffs or defendants, the presence of but one nondiverse party divests the district court of original jurisdiction over the entire action.").

Because those claims form part of the same "case or controversy" as the Veales' federal claims, however, this court is empowered to exercise supplemental jurisdiction over them under 28 U.S.C. § 1367(a).  Whether or not to do so lies wholly within the discretion of the court.  See 28 U.S.C. § 1367(c)(3); Rodriguez v. Doral Mortg. Corp., 57 F.3d 1168, 1177 (1st Cir. 1995).  As a general principle, though, "the unfavorable disposition of a plaintiff's federal claims at the early stages of suit, well before the commencement of trial, will trigger the dismissal without prejudice of any supplemental state-law claims."  Id.; see also United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial . . . the state claims should be dismissed as well.").  With this instruction in mind, and taking into account concerns of both judicial economy and federalism (in particular the concern of interpreting state law in a matter devoid of any federal interest), the court declines to exercise jurisdiction over plaintiffs' state-law claims.  Plaintiffs' state-law claims are therefore dismissed without prejudice.

## IV.  **Conclusion**

For the reasons set forth above, the Rule 12(b)(6) and 12(b)(1) motions to dismiss by Veterinary Emergency Center of Manchester, Veterinary Emergency and Specialty Center of New England, Animal Medical Center, New England Veterinary Oncology Group, Jeff Philibert, Stephen Angell, Tufts University, Steven Rowell, and Capital Area Veterinary Emergency Center[2] are GRANTED.  All other pending motions in the case[3] are DENIED as moot.  The clerk shall enter judgment accordingly and close the case.[4]

---

[2]Document nos. 27, 37, 43, 50, 63, 69, 79.

[3]Document nos. 20, 28, 62, 73.

[4]Although the motion to dismiss filed by defendants Robert Furness and Apple Tree Animal Hospital (document no. 20) is moot and this court need not consider it, the court would be remiss in not at least mentioning it.  The entire argument section of that single-page motion is as follows:

> In support of this motion, defendants offer the following:
>
> 1.  The Summons is dated November 29, 2010; and
>
> 2.  On March 9, 2011, plaintiffs delivered to defendants the Summons.

While this would otherwise be cryptic, the caption of the motion helpfully explains "TIME LIMIT FOR SERVICE EXCEEDED, RULE 4(m)." This is an apparent reference to Federal Rule of Civil Procedure 4(m), which governs the time for service of process; the rule provides that a defendant must be "served within 120 days after the complaint is filed."

The motion's reference to the date of the summons is somewhat confusing, as Rule 4(m) assigns no significance whatsoever to that date.  More to the point, though, on November 24, 2010, this court ordered that service be made "within 120 days"--in other words, by March 24, 2011.  Service of process on Dr. Furness and

**SO ORDERED.**

/s/Joseph N. Laplante
Joseph N. Laplante
United States District Judge

February 2, 2012

cc:  David T. Veale (pro se)
     Scott W. Veale (pro se)
     James D. Gleason, Esq.
     Alan D. Rose, Esq.
     Lisa A. Tenerowicz, Esq.
     Jay M. Niederman, Esq.
     Michael Magerer, Esq.
     Molly J. Brown, Esq.
     Michael P. Johnson, Esq.
     Russell F. Hilliard, Esq.
     Richard S. Loftus, Esq.
     Mark A. Darling, Esq.
     John L. Kerr, Esq.
     Wilfred J. Desmarais, Jr., Esq.
     Mark E. Howard, Esq.
     Ralph Suozzo, Esq.
     Jonathan M. Shirley, Esq.

---

Apple Tree on March 9, 2011 was therefore timely and their motion to dismiss is meritless.

The Veales claim in their opposition to the motion that they made counsel aware of his mistake, but that he refused to withdraw the motion.  If this is in fact true, counsel's actions are difficult to understand.  The court is loath to impose sanctions for this conduct, but counsel for Dr. Furness and Apple Tree is advised to scrutinize the docket of each case closely when he first enters an appearance, so as not to repeat this mistake.

14